**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ERNESTO GALARZA** | : | |
| | : | **CIVIL ACTION NO.** |
| | : | |
| **v.** | : | **3:01 CV 986 (AWT)** |
| | : | |
| | : | **May 24, 2004** |
| **LOMBARD FORD and ROBERT** | : | |
| **LOMBARD** | : | |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Ernesto Galarza, Plaintiff herein, opposes Defendants' Motion for Summary

Judgment as follows:

**General History**

In 1999, Lombard Ford was seeking a general manager for its Ford car and truck

dealership in Winsted.  It interviewed three candidates, one of whom was Ernie Galarza,

Plaintiff.  Plaintiff had a series of three interviews with Robert Lombard and his wife.

Mrs. Galarza came to Winsted for the third interview.  Plaintiff accepted the Lombards

offer to work as the general manager.

Plaintiff and his family had lived in New Jersey.  All of Plaintiff's previous work

experience had been in New Jersey, where he had successfully worked in the

automobile business.  It was a significant decision to uproot his family and separate

himself for his business contacts.  He accepted the job because Robert Lombard

promised a long term relationship and partial (and perhaps full) ownership of the dealership. He asked for a written contract, but Lombard demurred, insisting that his 'word is my bond.' Plaintiff relied on Lombard's promises.

Lombard's business life was at a crossroad. He had begun a boat dealership, to which he wanted to devote most of his attention. He wanted to transition away from the auto dealership. Lombard Ford was experiencing significant difficulties. For two years, Lombard Ford had been losing sales to Litchfield Ford, its primary competitor. Lombard believed that his employees were disloyal and betraying confidential information to Litchfield Ford. He had the dealership swept for electronic surveillance equipment. And he informed Plaintiff that he wanted to 'clean house' at the dealership, starting with the "hebe,"[1] Dave Bettigol.

During the interview process and afterward, Lombard believe that Plaintiff was of Italian descent. Lombard introduced Plaintiff as his "new guinea wop" to Mr. Fercodini, John Dagata, Tom Spinella, and other dealership employees. Plaintiff did not reveal his Hispanic heritage because he feared that it might compromise his eligibility for the position and then that it might prevent him from demonstrating his abilities. After he was hired, Plaintiff's wife saw Lombard introduce Plaintiff to third parties as his new "guinea wop." Kathleen Galarza affidavit, ¶11. [2]

_____

[1] A Jewish slur. Bettigol was believed to be Jewish.

[2] As he was making Litchfield County look more attractive to Mrs. Galarza, Rob Lombard told her that there were very few African-Americans living in the area. Kathleen Galarza affidavit, ¶8.

The personnel form completed by Plaintiff was altered after his termination to reflect Plaintiff's heritage. Exhibit H  That disclosure was not made by Plaintiff when he completed the form. Galarza affidavit, ¶25.  Someone altered the form at a later date.

Lombard's discovery of Plaintiff's heritage occurred when Plaintiff's son was hired as a temporary employee during the Thanksgiving school break.  His son is dark complected, and Lombard asked why his son was so much darker than him.  At that time, Plaintiff revealed that his father was from Ecuador.  From that point forward, the relationship deteriorated, despite Plaintiff's highly acclaimed performance.

Lombard had a history of refusing to comply with anti-discrimination laws. Lombard approved all hires and terminations.  When Plaintiff sought to employ an African-American salesman, Lombard refused to allow him to do so because of race. Lombard summarily terminated two long time female employees because they were "too old."  The sales force was white and remained white under Lombard's direction.

The motion for summary judgment depicts Plaintiff as an inept and incompetent manager who ran the business into the ground.  Such a description is contrary to Plaintiff's recognized performance.  During Plaintiff's tenure, Ford Motor Company's highest and most select dealership honor was the President's Award.  When Plaintiff first arrived at the dealership, the Lombards did not believe that the dealership could achieve the award for 1999, telling Plaintiff that it would be a "miracle" if the dealership received the award.  Plaintiff made the 1999 President's Award his goal, and he achieved it.  Based upon the information provided by the dealership, Ford concluded that Lombard Ford's performance ranked it as a superior dealership during Plaintiff's tenure.  Ford Motor Company described the award as follows:

"These Ford and Lincoln Mercury dealers were **recognized by their customers for outstanding leadership in sales, service and overall ownership experience**.  Ford Motor Company is proud to salute them with our 1999 President's Award."

(Emphasis supplied) Attachment 2 to the Galarza Affidavit.

Lombard depicts himself as a kind mentor who desperately sought to improve Plaintiff's business methods without success.  It is simply untrue.  There were no counseling sessions.  Lombard initiated or approved every employee termination; he had wanted to clean house because he suspected his employees of disloyalty.   He inflated the dealership's expenses by causing the auto dealership to absorb advertising and other costs of the failing boat dealership.  The purported failures described by Lombard are contradicted by the President's Award and the Ford Motor published "1984 Report," both of which reflect a highly successful dealership under the operation of Plaintiff.  The only reason to summarily terminate Plaintiff and escort him from the premises was to eliminate an Hispanic employee, who Lombard initially believed was Italian.  Lombard's only defense to the charge of racial and ethnic motivated termination is to malign Plaintiff's management, a defense contrary to the findings of Ford Motor Company in its President's Award.

**Claims to be Abandoned.**

Since the filing of this action, the law has changed and Plaintiff abandons the

following claims:

FOURTH COUNT - Negligent Infliction of Emotional Distress

TENTH COUNT - Invasion of Privacy

THIRTEENTH COUNT - Theft

**Argument**

**1.     The res judicata defense is frivolous.**

Plaintiff asserted claims of racial, ethnic, national origin, ancestry and color under

Title VII and its state counterpart with the CHRO.  As is its practice, the CHRO conducts

a preliminary review of the competing allegations under the Merit Assessment Review

("MAR") pursuant to Connecticut General Statutes Section 46a-83(b).  The MAR

program expedites review of the discrimination claims, allowing for a summary

determination based upon the conflicting affidavits before it.  It is a practice intended to

reduce the caseload of the CHRO and to permit it to address those claims it considers

to be most serious.  The CHRO dismissed Plaintiff's CHRO and EEOC complaints.

The MAR program is a streamlined procedure.  There is no evidentiary hearing.

The CHRO interviews no witnesses or determines matters of credibility.  The parties are

not allowed to cross-exam witnesses, obtain relevant documents from the employer, or

otherwise engage in a full hearing process.   That is to say, "the statute permits the

CHRO to dismiss a complaint without conducting a full investigation."  *Wallace v.*

*CHRO*, 1998 WL 525454, CV97-0403722.

The CHRO itself is not a forum which could provide full relief to the claimant. By statute, the CHRO may not award a claimant compensatory damages or attorneys fees. *Bridgeport Hospital v. Commission on Human Rights & Opportunities*, 232 Conn. 91, 653 A.2d 782 (1995). These limitations prompt claimants to seek escape from the administrative process at the earliest opportunity.

When a complaint is dismissed under the MAR program, the claimant faces a choice of forum. He may pursue an administrative appeal or bring a private civil action. A claimant "may request", but is not required to request, reconsideration of a MAR dismissal by the CHRO. Conn. Gen. Stat. Ann.46a-83(e). When a complaint is dismissed under the MAR program and no reconsideration is requested, the CHRO is required to issued a release of jurisdiction, thereby allowing the complainant to file suit in Superior Court against the employer. Conn. Gen. Stat. Ann. §46a-83a(a). [3]

Defendants argue that this explicit statutory choice is illusory and that principles of res judicata effectively pretermit any judicial action. Indeed, they argue that a claimant may only seek administrative review of a MAR dismissal, thereby precluding the statutory right to seek relief against the employer in a judicial action. Thus, the

---

[3] § 46a-83a (a) "If a complaint is dismissed pursuant to subsection (b) of section 46a-83 [MAR Program], or is dismissed for failure to accept full relief pursuant to subsection (c) of said section 46a-83, and the complainant does not request reconsideration of such a dismissal as provided in subsection (e) of said section 46a-83 the executive director of the commission shall issue a release and the complainant may, within ninety days of receipt of the release from the commission, bring an action in accordance with section 46a-100 and sections 46a-102 to 46a-104, inclusive."

carefully preserved right to sue in court, expressed in both the statute and the release of jurisdiction notice, is, according to Defendants, a nullity.[4]

Defendants provide no statutory framework for their claim, but rely upon a case both factually and procedurally inapplicable to this case.  In *Kalanquin v. Heublin*, the CHRO dismissed the claim under the MAR program, and the claimant pursued the administrative route.  She appealed the dismissal to the Commission and, when she was unsuccessful, she brought appealed the Commission's decision to the Superior Court.  The Superior Court affirmed the Commission's decision, applying principles for review of an administrative decision.  *Kalanquin v. CHRO*, 1998 WL 57767 (Super. Ct.) (Copy attached).

Nine months after beginning her administrative appeal to the Superior Court, she instituted a civil action against her employer.  When the Superior Court affirmed the Commission's decision, the employer moved to dismiss on the basis of res judicata. Judge Burns observed that "a Connecticut trial court did review and dismiss Plaintiff's appeal on its merits" and held that the first judicial action was res judicata on the issues in the second judicial action.  It was not the MAR dismissal which precluded the second suit, but the determination of the Superior Court in the first suit.

Unlike *Kalanquin*, Galarza never sought administrative review.  There was no further administrative proceeding, nor did Galarza seek an administrative review in Superior Court.  Instead, Galarza proceeded directly to federal court.

---

[4]      The release of jurisdiction, Defendants' Exhibit V,  informs the claimant that he "is hereby authorized to commence a civil action in accordance with Section 46a-100 . . ."

Federal law is abundantly clear that CHRO actions do not preclude a private suit against the employer.  In *Chandler v. Roudebush,* 425 U.S. 840, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976) and again in University of Tennessee v. Elliot, 478 U.S. 788,  106 S.Ct. 3220, 92 L.Ed.2d 635 (1986.), the Supreme Court rejected the proposition that the decisions of reviewing administrative agencies would deny a claim a right to a trial de novo on his Title VII claim.

The proposition that a MAR dismissal, without more, precludes this action is simply frivolous.

**2.     The issue of illegal discrimination involves disputed issues of material fact.**

Defendants contend, as a matter of law, that there are no disputed issues of material fact as to whether they were motivated by racial or ethnic animus.  The conflicting affidavits and testimony demonstrate that this issue is not capable of summary disposition.

First, Defendants argue that they are entitled to the "same actor" inference, to wit, that the decision maker who both hires and fires could not be motivated by illegal animus.  The argue rests on the false assertion that "it is undisputed that Mr. Lombard was aware of Plaintiff's race and notion origin prior to his hire." Brief at p. 20.  To the contrary, Plaintiff avers that he did not make Lombard aware of his ethnicity during his interviews because he was concerned about discrimination bias. Galarza affidavit, ¶22-26.   Defendants rely upon a new employee information form indicating Plaintiff's race as Hispanic. Defendants' Exhibit H .  Plaintiff avers that he did not complete the ethnicity portion of the form, and never completes such forms.   Galarza affidavit, ¶25. Plaintiff contends that the employment form was altered by unknown hands after his

termination.   Galarza affidavit, ¶26.  This testimony is consistent with the affidavit of

Mrs. Galarza, who witnessed Lombard continuing to present her husband to others as

his new "guinea wop" after he started his job.  Kathleen Galarza affidavit, ¶11.

According to Plaintiff, Lombard became aware of Plaintiff's ethnicity only when

his much darker complected son was temporarily employed by Lombard.  Galarza

affidavit, ¶83.   In response to Lombard's inquiry, Mr. Galarza described his Hispanic

ancestry.  Despite Plaintiff's operational and management success, Lombard withdrew

his support and friendship after that admission.  Given Plaintiff's performance which

achieved for Lombard Ford the highest recognition of Ford Motor Company, Lombard's

actions, language, behavior and conduct suggest racial and ethnic motivations for

Plaintiff's termination.

Indeed, Lombard has presented a consistent history of ethnic and racial

discrimination. During the interview process, Lombard attempted to portray Litchfield

County as an attractive area by noting that there were few African-Americans living in

the area, an aspect of life he indicated was positive and desirable.  Kathleen Galarza

affidavit, ¶8.  During Plaintiff's tenure, Lombard refused to allow him to hire African-

American salesmen.   Galarza affidavit, ¶78.  Lombard and another salesman discussed

interracial couples as being abhorrent, with Lombard agreeing with the salesman that

such pairings 'made him sick."   Galarza affidavit, ¶81. [5]  The summary judgment record

does not permit a determination of whether Plaintiff's termination was motivated by

race, color, or ethnic bias. A reasonable jury could find unlawful bias.

---

[5]  Plaintiff is married to a woman of Irish and German heritage and may be
considered by some as a 'mixed' couple. Galarza affidavit, ¶82.

Second, Defendants argue that Plaintiff cannot meet the initial burden to demonstrate that he performed satisfactorily.  The 1999 President's Award, earned during Plaintiff's tenure and primarily under his management, is a testament to his exemplary performance.   Galarza affidavit, ¶¶27-35.  The 1984 Report, compiled by Ford Motor Company from information provided by Lombard Ford and similarly situated dealers in the Northeast, also points to good performance. See attachment to Galarza affidavit.   For example, Lombard Ford's operating profit was 57% greater than the average of its peers.  Galarza affidavit, ¶32.  Based upon this data, Ford Motor Company selected Lombard Ford as one of the best dealerships in the country. There is clearly a disputed issue of material fact with respect to performance. These performance indicators do not reflect the alleged incompetence which serves as the basis for Defendants' summary judgment motion.

Third, Defendants suggest that there is no evidence of discrimination, a suggestion that cannot endure in the face of Plaintiff's summary judgment evidence.  In Mr. Galarza's affidavit, he indicates that (1) Lombard referred to "spics" and "niggers" as good reasons to leave New Jersey, (2) Lombard refused to hire African-American sales persons, and (3) Lombard found mixed race marriages to be disgusting.   Galarza affidavit, ¶¶74-83.  Given Plaintiff's fall from favor after his own ethnicity was discovered, there is a material issue of fact as to whether Defendants were motivated by illegal bias.

**Changing Explanations for Termination Imply Pretext.**

The summary judgment record reflects Defendants' uncertainty about the true reason for termination. At the time of termination, Lombard refused to provide Plaintiff with any explanation whatsoever. Galarza affidavit, ¶87. In the summary judgment record, Defendants suggest that the termination was for poor performance or "incompetence." Brief @ 8. Later, they suggest that there was a reorganization which eliminated his position. Defendants' Brief @ 13-4. Whether unlawful bias was a motivating factor is clearly an issue of material fact in this case.

The burden shifting analysis requires that an employer must be actually motivated by legitimate non-discriminatory reasons to meet a prima facie case of discrimination. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1989) (plurality opinion) (employer's legitimate reason for discharge in mixed-motive case will not suffice "if that reason did not motivate it at the time of the decision"); *Taggart v. Time*, 924 F 2d 43 (2nd Cir. 1991); *Nichols v Lewis Grocer*, 138 F. 3d 563, 567-8 (5th Cir. 1998); *Dominguez-Cruz v. Shuttle Caribe*, 202 F. 3d 424, 431 (1st Cir. 2000). Merely proving that the decision to terminate could have been justified is simply not the same as proving that the termination decision would have been made in the absent of bias. The conflicting evidence does not allow for summary judgment.

Further, Defendants assume, wrongly, that circumstantial evidence of discriminatory animus is insufficient to support a judgment in favor of Plaintiff. Lombard's behavior, conduct and language is sufficient to create a material issue of genuine fact. Desert Palace, Inc. v. Costa, 539 U.S. 90, 123 S.Ct. 2148 (2003). In this

summary judgment proceeding, Plaintiff's burden is simply to present "sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Desert Palace, Inc. v. Costa, *supra*.  Given the repetitive comments and conduct concerning Lombard's racial preferences and his reliance upon a misplaced "guinea wop" heritage, a reasonable jury could find that race, color and national origin was a motivating factor in Plaintiff's termination.

**Intentional Infliction**

To recover for intentional infliction of emotional distress, four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." (Internal quotation marks omitted.). *Dollard v. Board of Education*, 63 Conn.App. 550, 553-54, 777 A.2d 714 (2001).

In this case, Defendants induced Plaintiff to trust and rely upon them in accepting their offer to become general manager.  After Lombard assured him that his 'word was his bond' and offered significant ownership and financial incentives, Plaintiff uprooted his family to an unfamiliar area.   After Lombard learned of Plaintiff's true ethnic identity, he waited until public announcement of the receipt of the President's Award before discharging Plaintiff.  Indeed, Plaintiff was terminated before the announcement was published in Dealers World.  See attachment to Galarza affidavit.  According to Plaintiff, he was terminated without explanation, and the promised employment reference was

never fulfilled.  Lombard suggests that he never meant to provide the reference in the first place.

The dislocation, the wrongful inducement and the racial innuendos all support outrageous behavior by Defendants.  These issues should be considered by a jury.

**Good Faith & Fair Dealing**

Plaintiff has alleged that, based upon the promises and inducements Defendants made to him to entice him to Connecticut, the subsequent termination and renunciation of such inducements breached the covenant of good faith owed to him.  The covenant is intended to emphasize faithfulness to the agreed common purpose and consistency with justified expectations of the parties. See, *Magnan v. Anaconda Enterprises, Inc.,* 210 Conn. 150 (1989); Restatement (Second) Contracts § 205 Comment a.  The covenant logically does not create new contractual obligations, but rather suggests that if several alternative constructions of a contract are possible, the one consistent with fair dealing and the reasonable expectations of the parties ought to be adopted.  "It is axiomatic that the ... duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. *See Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 566, 479 A.2d 781 (1984); see also 2 Restatement (Second), Contracts § 205 (1979) ('[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement').

"The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Neiditz v. Housing Authority*, 43 Conn.Sup. 283, 294, 654 A.2d 812 (1994), aff'd., 231 Conn. 598, 651 A.2d

1295 (1995).  In their summary judgment evidence, Defendants concede that they used the lure of ownership to induce Plaintiff to accept the job.  Defendants' Rule 56 Statement, ¶14.  (Description of stock appreciation discussion).  Since the parties agree that some form of equity ownership was part of the inducement to contract, there is the necessary predicate for a claim of breach of the duty of good faith and fair dealing. *Hoskins v. Titan Value Equities Group, Inc.*, 252 Conn. 789, 793, 749 A.2d 1144 (2000); *Macomber v. Travelers Property & Casualty Corp.*, 261 Conn. 620, 638 (2002).

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement ... Essentially it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended ... Conversely, [b]ad faith means more than mere negligence; it involves a dishonest purpose." (Citations omitted; internal quotation marks omitted.) *Middletown Commercial Associates Ltd. Partnership v. Middletown*, 53 Conn.App. 432, 437, 730 A.2d 1201, cert. denied, 250 Conn. 919, 738 A.2d 657 (1999); *Barber v. Jacobs*, 58 Conn.App. 330, 338, 753 A.2d 430 (2000).  Plaintiff has been wrongfully deprived of key inducements and the covenant of good faith assures him that he will receive the benefit of the bargain. The parties having agreed that ownership was a material part of the employment discussion, the covenant of good faith prevents Defendants from acting arbitrarily to deny him the benefits of the promises made and relied upon.  Even where an agreement provides one party with discretion as to entitlement, that discretion must be exercised in a sound and honest manner and in good faith. *Sadowski v. Dell Computer Corp.*, 268 F.Supp.2d 129, 136  (D. Conn. 2003)(Texas law).

Plaintiff's action for breach of the covenant of good faith and fair dealing requires proof of three essential elements: first, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith. *Fairfield Financial Mortgage Group, Inc. v. Salazar*, No. CV000339752S, 2002 WL 1009809, at 3 (Conn.Super. 2002) (copy attached). In this case, Plaintiff reasonably expected to receive the benefits offered, particularly in light of the superior performance recognized in the President's Award and the 1984 Report. By terminating Plaintiff, Defendants injured that reasonable expectancy. Lastly, a reasonable inference is that Defendants acted in bad faith because (1) Plaintiff's performance created nationally recognized achievement by Lombard Ford, (2) Defendants retained Plaintiff until after the President's Award was issued to avoid any potential disqualification, (3) Defendants lead Plaintiff to believe that the meeting was to discuss ownership and increased compensation instead of termination, and (4) Defendants had expressed racial and ethnic hostility.

**Breach of Contract**

Defendants seek summary judgment on the breach of contract claims, alleged as express and implied contracts. As set forth above, Defendants made numerous promises to Plaintiff to induce him to accept the job as general manager, including (1) a job for life, (2) ownership, and (3) bonuses based upon performance. Plaintiff

performed as promised, a performance which earned the dealership the highest recognition possible from Ford Motor Company.  He earned the inducements offered.

Citing *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206 (1987), Defendants note that a "contract implied in fact, like an express contract, depends upon actual agreement."  Brief @ p. 32.  Interestingly, Defendants concede that ownership was discussed as an inducement to Plaintiff.  See, Defendants' Rule 56 statement. ¶14.  That agreement, reiterated in all three pre-employment interviews, induced Plaintiff to move his family from New Jersey.  He did so upon Lombard's promise that 'his word was his bond.'  Such inducements and promises are entitled to be enforced as contractual entitlements.   Consequences arise from promises which are intended to induce action and reliance, and Plaintiff is entitled to enforce the same.

**Unpaid Wages**

Defendants summarily dismiss the wage claim asserted in Count Eleven, with scant argument and no evidence.  Plaintiff asserts entitlement to a bonus based upon performance, and expected to receive one when called to the termination meeting.  Defendants had indicated that a bonus was forthcoming during the previous month.  It was never paid.

The bonus was earned through superior performance culminating in the President's Award.  It was promised both before and after employment.  Since Defendants' ignore the wage claim and fail to articulate why it should fail, summary judgment cannot be granted on this issue.

An employee properly states a claim under the wage statutes for bonus which would have been earned but for wrongful termination or pursuant to agreement with the employer. *Pereira v. DSL Net, Inc.*, 2000 WL 1207269 (Conn.Super.), 27 Conn. L. Rptr. 643 (Conn.Super. 2000)(copy attached).  Conn. Gen. Stat. Ann.§ 31-72 is a remedial statute which must be liberally construed in favor of employees, the persons whom the legislature intended to benefit by such legislation.  *Id.*  In wage cases, the employer has the burden of proof concerning the validity of non-payment. *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 32-33, 662 A.2d 89 (1995).

Count 12 asserts individual liability for the dealership's failure to pay the wages earned by Plaintiff through the bonus.  *Butler, Commissioner of Labor ex rel.  v. Hartford Technical Institute, Inc.*, et al., 243 Conn. 454,  704 A.2d 222 (1997) holds that such liability rests with the person who has "the ultimate responsible authority to set the hours of employment and to pay wages and is the specific cause of the wage violation." Defendants make no argument, and present no evidence, indicating that Lombard does not have personal responsibility under the statute.

**Summary**

As set forth most particularly in the supporting affidavits and Rule 56 Statement, most material facts are strongly disputed.  Where Lombard represents that Plaintiff had poor performance, Ford Motor Company rated it as superior.  Where Lombard represents that Plaintiff fired the staff, it is clear that Lombard wanted to 'clean house' and hired Plaintiff to avoid the 'taint' of the locals.  Lombard claims Plaintiff increased expenses, while Plaintiff reports that Lombard weighed down the dealership with the expenses of the boat advertising.  Where Lombard states that Plaintiff fired Drake

Viscone, yelled at employees, wrongly sent vehicles overseas, Plaintiff avers that

Lombard is describing his own actions and orders.

Virtually every fact asserted by Defendants to support their motion is disputed.

This matter must be resolved through a jury verdict.  The motion should be denied.

**ERNESTO GALARZA**
**PLAINTIFF**


By:  _____
Charles D. Houlihan, Jr.
Federal Bar No. CT 11416
Post Office Box 582
Simsbury, CT 06070

Telephone:   (860) 658-9668
E-Mail:      CDH atty @ aol.com
Telecopier:   (860) 658-1339

**ATTORNEY FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been mailed by United States mail, postage pre-paid, to the following:

Kevin Brady, Esq.
Halloran & Sage
One Goodwin Square
225 Asylum Street
Hartford CT 06103

on May 24, 2004.

_____
Charles D. Houlihan, Jr.


**Opposition to Motion for Summary Judgment - Page 18**

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
27 Conn. L. Rptr. 643
**(Cite as: 2000 WL 1207269 (Conn.Super.))**
<KeyCite Citations>
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Connecticut.

Frank W. PEREIRA,
v.
DSL NET, INC.

No. CV 990428948.

July 28, 2000.

MEMORANDUM OF DECISION

OWENS

 *1 The issue before the court is whether stock
options that have not vested, due to an alleged
wrongful termination prior to the vesting date,
constitute "wages" as defined in General Statutes
§ 31-71a(3) for the purpose of maintaining a
claim for recovery of unpaid wages pursuant to
General Statutes § 31-72.

 This court finds that an employee may state a
claim for unpaid wages under General Statutes
§ 31-72 when an employee's "wages" would
have vested or accrued but for an employer's
alleged wrongful termination in violation of this
state's public policy. Accordingly, the defendant's
motion to strike count three of the plaintiff's
verified complaint is denied.

 FACTS

 The plaintiff, Frank W. Pereira, alleges the
following facts in his four-count verified complaint
dated July 28, 1999. Pereira was employed by
DSL. Net, Inc. as Senior Vice President,
Marketing and Sales. DSL's offer of employment
to Pereira was made in a letter dated March 12,
1999, which listed Pereira's compensation
package, which included stock options that
afforded Pereira the opportunity to purchase
certain quantities of DSL stock at a stated price
and at a stated time. [FN1] Pereira commenced
working for DSL in March 1999. DSL terminated
Pereira's employment on May 10, 1999, before

the first vesting date of the stock options. Pereira
alleges that DSL wrongfully terminated him for
refusing to participate in DSL's fraudulent
representation to investors regarding the
company's business plan in connection with an
initial public offering of company stock.

 FN1. The March 12, 1999 letter
 containing the details of the stock
 options and the vesting schedule reads
 as follows:
 4. Initial options to purchase 200,000
 (two hundred thousand) shares of
 DSL.net common stock, at an exercise
 price of $0.10 per share, which vest over
 a four year period at twenty-five (25%)
 per year. Twenty-five (25%) of the
 options will vest on the first anniversary
 of your start date, and the remaining
 seventy-five percent (75%) over the
 succeeding three (3) year period in equal
 increments. 5. You will also have the
 option to purchase an additional 100,000
 (one hundred thousand) shares of
 DSL.net common stock, at an exercise
 price of $0.10 per share, which vest over
 a four year period at twenty-five (25%)
 per year. Twenty-five (25%) of the
 options will vest on the first anniversary
 of your start date, and the remaining
 seventy-five percent (75%) over the
 succeeding three (3) year period in equal
 increments, provided DSL.net meets
 sales revenue of $6.5M (six million five
 hundred thousand) by January 1, 2000.
 6. You will also have the option to
 purchase an additional 100,000 (one
 hundred thousand) shares of DSL.net
 common stock, at an exercise price of
 $0.10 per share, which vest over a four
 year period at twenty-five (25%) per
 year. Twenty-five percent (25%) of the
 options will vest on the first anniversary
 of your start date, and the remaining
 seventy-five percent (75%) over the
 succeeding three (3) year period in equal
 increments, provided DSL.net meets
 sales revenue of $44.3M (forty-four
 million three hundred thousand) on or

before September 1, 2000. (Verified Complaint, Exhibit A.)

Count one alleges a wrongful termination claim. Count two is a claim for breach of representations, breach of an employment agreement and breach of the covenant of good faith and fair dealing. Count three alleges DSL willfully refused to pay Pereira his stock options, and, pursuant to General Statutes § 31-72, he is entitled to double damages, costs and attorneys fees. Count four, in which Pereira requests injunctive relief, has been resolved by stipulation approved by the court, Pittman, J., on August 9, 1999.

On September 9, 1999, DSL filed a motion to strike accompanied by a memorandum of law. DSL is moving to strike count three of Pereira's verified complaint on the ground that it fails to state a claim under General Statutes § 31-72, because stock options that have not vested are not "wages" as defined by the statute. On December 2, 1999, Pereira filed a memorandum of law in opposition to the motion to strike, and, on April 12, 2000, DSL filed a reply brief in support of its motion to strike.

I. DISCUSSION

Practice Book § 10-39(a) provides, in pertinent part: "Whenever any party wishes to contest (1) the legal sufficiency of the allegations of any complaint, counterclaim or cross claim, or of any one or more counts thereof, to state a claim upon which relief can be granted ... that party may do so by filing a motion to strike the contested pleading or part thereof." The trial court's role is to examine the contested count, construed in the favor of the pleader, to determine whether a legally sufficient cause of action has been stated. *Napoletano v. Cigna Healthcare of Connecticut, Inc.,* 238 Conn. 216, 232-33, 680 A.2d 127 (1996), *cert. denied,* 520 U.S. 1103, 117 S.Ct. 1106, 137 L.Ed.2d 308 (1997).

*2 DSL is moving to strike count three on the ground that it fails to state a claim for unpaid wages under General Statutes § 31-72 because unvested stock options are not wages as defined by the statute. [FN2] DSL contends that the definition of "wages" found in General Statutes § 31-71a(3) contains the past tense of the word "rendered," and, therefore, an employee's alleged right to compensation must have vested

in order to fall within the statutory definition of "wages." DSL asserts that Pereira's unpaid wage claim for stock options has not vested because his termination occurred ten months before the first scheduled vesting date of March 2000. DSL relies on *Swihart v. County Home Bakers, Inc.,* Superior Court, judicial district of Ansonia-Milford at Milford, Docket No. 060945 (December 3, 1998) (Corradino, J.). In that case, the court determined that a **bonus** and fringe benefits did not constitute "**wages**" within the meaning of General Statutes § 31-72 because the purported "**wage**" claim had not vested. Similarly, DSL contends that the stock options at issue in this case do not constitute "compensation for services rendered" within the meaning of the statute because they have not vested.

> FN2. For purposes of clarity, the defendant never argues that count three should be stricken on the ground that it fails to state a claim under General Statutes § 31-72 because stock options, themselves, do not constitute "wages" within the meaning of the statute, rather it argues that the stock options at issue do not fall within the statutory definition because they are unvested.

Initially, Pereira counters that DSL's motion is procedurally defective because it violates the well-established rule that a movant cannot move to strike selected paragraphs of a count but can only move to strike an entire count. Pereira argues that the motion improperly challenges only that portion of count three alleging statutory damages pursuant to General Statutes § 31- 72, and not the entire third count, which he asserts alleges a breach of contract claim. Pereira contends that the motion to strike should be denied on the claimed procedural defect alone.

In response, DSL argues in its reply brief that it has properly moved to strike the entire third count and not merely a portion of that count. DSL refutes Pereira's assertion that count three alleges a claim for breach of contract. DSL contends that claims brought pursuant to General Statutes § 31-72 set forth a specific cause of action based on alleged violations of General Statutes §§ 31-71a to 31-71i and 31-76k and, therefore, count three must stand or fall on whether the statutory requirements have been met. Alternatively, DSL argues that if Pereira can show that count three is a breach of contract

claim, then paragraph thirty-eight of count three should be stricken because it unsuccessfully attempts to state a separate cause of action for unpaid wages under General Statutes § 31-72.

Before addressing the substantive merits of the parties' arguments, this court will first address the procedural objection to the motion to strike. "[W]here individual paragraphs standing alone do not purport to state a cause of action, a motion to strike cannot be used to attack the legal sufficiency of those paragraphs ... A single paragraph or paragraphs can only be attacked for insufficiency when a cause of action is therein attempted to be stated." (Internal quotation marks omitted.) *Mirjavadi v. Bakilzadeh,* Superior Court, judicial district of Stamford Norwalk at Stamford, Docket No. 166632 (June 9, 1999) (D'Andrea, J.). Count three, read in a light most favorable to the plaintiff, alleges a breach of employment agreement in paragraph 35 and alleges a claim for statutory damages under General Statutes § 31-72 in paragraph 38 . [FN3] General Statutes § 31-72, **entitled** "*Civil action to collect **wage** claim, fringe benefit claim or arbitration award,*" provides, in relevant part, that "an **employee** or a labor organization [representing an **employee**] may **recover**, in a civil action" twice the full amount of unpaid **wages**, costs and reasonable attorneys fees. The statute provides an **employee** with an independent statutory right to bring an action to **recover** unpaid **wages** against an employer. The Supreme Court has interpreted the statute to provide an **employee** with a statutory right to pursue an unpaid **wage** claim after exhausting administrative remedies through any grievance procedures under any applicable collective bargaining agreements. See *Shortt v. New Milford Police Dept.,* 212 Conn. 294, 310, 562 A.2d 7 (1989) (court construes General Statutes § 31-72 as a statute for wage collection coexisting with wage disputes subject to grievance procedures outlining collective bargaining agreements); *Hoffman v. Corporate Display Spec, Inc.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 284682, 6 CONN.L.RPTR. 407 (May 4, 1992) (Melville, J.) (denying a motion to dismiss, which attacked the court's subject matter jurisdiction over an employee's action to recover unpaid wages pursuant to General Statutes § 31-72 arguing that the employee failed to exhaust administrative remedies, upon finding that an employee without available recourse through the

labor commission has "an independent right to bring a civil action" under the statute). Because paragraph 35 of count three alleges a breach of the employment agreement and paragraph 38 alleges a separate cause of action pursuant to General Statutes § 31-72, this court may properly treat the motion to strike as attacking paragraph 38, alone. See *Mirjavadi v. Bakilzadeh, supra,* Superior Court, Docket No. 166632.

> FN3. In count three, Pereira incorporates paragraphs one through thirty- four of count one and contains additional allegations. Pereira alleges that "DSL.net has refused to pay [him] the stock options it agreed to pay him in compensation for his services, in breach of its employment agreement with him [and that] DSL.net has willfully refused to pay [him] his stock options in retaliation for [his] refusal to participate in DSL.net's fraud upon its investors and underwriters and his attempt to correct his and the company's prior misstatements to investors and underwriters upon realizing they were false." (Verified Complaint, Count 3, ¶ 35-36.) He further alleges that he "suffered economic loss as a result of being denied the compensation that was promised for his employment at DSL.net [and that] [p]ursuant to Conn.Gen.Stat. § 31-72, [he] is entitled to double damages, costs and attorneys fees for DSL.net's willful refusal to pay him the stock options it promised as part of his compensation." (Verified Complaint, Count 3, ¶ 37-38.)

**\*3** Turning to the substantive arguments, Pereira argues that he has a vested right of ownership in the stock options. He asserts that the stock options were not intended as compensation for future services but were immediate compensation for his leaving a higher paying position and foregoing other employment in order to work for DSL. He further asserts that the vesting schedule for the stock options merely specifies the dates on which he could exercise his right to purchase the stocks and has no bearing on whether his **entitlement** exists. He contends that the award of stock options is not conditional or discretionary, and, therefore, *Swihart v. Country Home Bakers, Inc., supra,* Superior Court, Docket No. 060945, the case on which DSL relies, is inapposite because the

**employee** in that case was seeking a discretionary **bonus** and fringe benefits. Pereira also argues that if the court were to find that stock options are analogous to a discretionary **bonus,** then the stock options still constitute "**wages**" within the meaning of General Statutes § 31-72 because they would have vested but for his wrongful termination. He relies on various appellate cases, which recognize **employees**' rights to **recover** future **wages** where the **employees** were wrongfully discharged in violation of this state's public policies. He relies on these cases for the proposition that DSL's wrongful termination prevented him from exercising his stock options according to the vesting schedule and, therefore, he is **entitled** to **recover** the **wages** he would have earned but for the wrongful termination. Pereira notes that DSL is not challenging the wrongful termination of employment allegations, and that count three contains allegations that DSL's wrongful termination prevented his options from vesting.

As to the substantive merits of the parties' arguments, this court's determination of whether the unvested stock options constitute "wages" as defined in General Statutes § 31-71a(3), in order to state a claim for unpaid wages under General Statutes § 31-72, shall be guided by the statutory language itself, the principles of statutory construction and the legislative intent in enacting the statutes. General Statutes § 31-72 provides that "[w]hen any employer fails to pay an employee wages in accordance with the provisions of sections 31-71a to 31-71i, inclusive, or fails to compensate an employee in accordance with section 31-76k [FN4] or where an employee or a labor organization representing an employee institutes an action to enforce an arbitration award which requires an employer to make an employee whole or to make payments to an employee welfare fund, such employee or labor organization may recover, in a civil action, twice the full amount of such wages, with costs and such reasonable attorneys fees as may be allowed by the court, and any agreement between him and his employer for payment of wages other than as specified in said sections shall be no defense to such action ..." General Statutes § 31-71a(3) defines the term "wages" contained in General Statutes § 31-72 as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis of calculation." "A primary rule of statutory construction is that if the language of the statute is clear, it is presumed that the words express the intent of the legislature ... The court must interpret the statute as written ... and it is to be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation ... Each word used by the legislature should be given effect and, as far as possible, the entire enactment is to be harmonized." (Citations omitted; internal quotation marks omitted.) *Ganim v. Roberts,* 204 Conn. 760, 763, 529 A.2d 94 (1987). "[T]he process of statutory interpretation involves a reasoned search for the intention of the legislature ... [T]o determine, in a reasoned manner, the meaning of the statutory language ... [the court looks] to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter ... *Luce v. United Technologies Corp.,* 247 Conn. 126, 133, 717 A.2d 747 (1998)." (Citations omitted; internal quotation marks omitted.) *Morales v.. Pentec, Inc.,* 57 Conn.App. 419, 426 (2000).

> FN4. General Statutes 31-76k entitled "Payment of fringe benefits upon termination of employment" provides, in pertinent part,
> [i]f an employer policy or collective bargaining agreement provides for the payment of accrued fringe benefits upon termination, including but not limited to paid vacations, holidays, sick days and earned leave, and an employee is terminated without having received such accrued fringe benefits, such employee shall be compensated for such accrued fringe benefits exclusive of normal pension benefits in the form of wages in accordance with such agreement or policy but in no case less than the earned average rate for the accrual period pursuant to sections 31-71a to 31-71i, inclusive.

 **\*4** A review of the legislative history of General Statutes §§ 31-72 and 31-71a, and the relevant amendments thereto, demonstrates that the primary purpose in enacting the statutes was to provide redress for employees denied earned wages. [FN5] See Conn. Joint Standing

Committee Hearings, Labor, 1978 Sess., pp. 154-55. The legislative history also shows that the legislature, in amending the statute to provide double damages for recovery of twice the amount of unpaid wages, intended to penalize employers who failed to pay employees earned wages and to deter employers from withholding earned wages. *Id.* See also *Butler v. Hartford Technical Institute, Inc.,* 243 Conn. 454, 463, 704 A.2d 222 (1997) (where the court's interpretation of General Statutes § 31- 72 "effectuates the statutory policies of compensating employees and deterring employers from failing to pay wages"). The legislative history further reveals that the legislature intended the double recovery provision to be remedial and punitive in nature and to constitute liquidated damages. [FN6] See 21 Sen.Proc., Pt. 6, 1978 Sess., p. 2144.

> FN5. In committee hearings held in 1978 to amend General Statutes § 31-72 to increase the penalties on employers, Senator Nancy L. Johnson from the 6th District urged the Labor Committee to raise a bill to change the statute governing recovery of unpaid wages. She remarked that [t]he penalty for non-payment of wages is set forth in Section 31-72, [and that] [a]n unpaid employee must bring suit in court and if he or she wins, he or she recovers wages and credit costs. This is hardly a sufficient penalty for so serious an offense as non-payment of wages. In fact, the employer loses nothing but court costs, while the employee has to bring suit and go without earned wages for months or years. Section 31-72 should be amended to require an employer who fails to pay wages as provided by law shall be liable to the employee in *the amount of their unpaid wages and in addition an equal amount of liquidated damages* ... The payment of *earned wages* is a basic gut-level right that should be assured by clear, strong state statutes. The weakness of these statutes came to my attention through the experience of a constituent ... A person must be able to count on his or her pay check--that it will be forthcoming if he or she has put in a week's work and that if paid by check, that that check will not bounce ... No **employee** should have to make good on

an employer's check and sue for **wage** payment.
(Emphasis added.) Conn. Joint Standing Committee Hearings, Labor, 1978 Sess., pp 154-55.

> FN6. Public Act 78-358 authorized recovery of twice the amount of unpaid **wages** and costs where recovery was previously limited to the amount of unpaid **wages** where an employer wilfully refused to pay **wages** that the **employee** would be **entitled** to **recover** double the amount of **wages** plus cost and attorneys fees. See 21 Sen.Proc., Pt. 6, 1978 Sess., p. 2144.

Connecticut's **wage** recovery statutes represent this state's public policy against the withholding of **wages** by employers. See *Cook v. Alexander & Alexander of Conn., Inc.,* 40 Conn.Sup. 246, 248, 488 A.2d 1295 (1985) (allegations that the plaintiff was discharged to avoid the vesting of **bonuses** and thrift plan benefits, which constitute unpaid **wages** within the meaning of General Statutes § 31-72, sufficient to allege a wrongful discharge claim); *Okon v. Medical Marketing Group, Inc.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 306032 (August 23, 1994) (Pittman, J.) (12 CONN.L.RPTR. 228, 228-29) (adopted the reasoning of the court in *Cook v. Alexander & Alexander of Conn., Inc., supra,* 40 Conn.Sup. 246, and found that "a complaint alleging that plaintiff's employment was terminated in order to prevent the vesting of certain rights to compensation [stock options] which, if vested, would be enforceable rights under Connecticut's wage protection statutes states a cause of action for wrongful termination"). "[T]he normal rule on an employment contract is that when the employee is prevented from fully performing because the employer wrongfully fired him, the employee can recover the wages he would have earned under the contract, minus any wages which he has earned or could have earned elsewhere, and the burden of proof of the latter is on the employer." (Internal quotation marks omitted.) *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.,* 234 Conn. 1, 32-33, 662 A.2d 89 (1995) (recognizing an employee's right to recover future lost wages, where limited to a reasonable time and supported by the evidence, in a wrongful discharge action alleging breach of an implied employment contract); see also

*Preston v. Phelps Dodge Copper Products, Inc.,* 35 Conn.App. 850, 859-61, 647 A.2d 364 (1994) (recognizing an employee's right to **recover wages** he would have earned but for being wrongfully terminated in violation of public policy); *Butler v. Cadbury Beverages, Inc.,* Docket No. 3:97-CV-2241(EBB), 1999 WL 464527, (D.Conn., June 30, 1999) (holding that an **employee** can state a claim under General Statutes § 31-72 to **recover** a discretionary **bonus** that had not vested according to the terms of the employer's **bonus** plan because the employer's alleged wrongful termination proximately caused the employee's failure to fulfill a condition for the **bonus** to vest).

 **\*5** This court finds that an **employee** can state a claim under General Statutes § 31-72 for **wages** the **employee** would have earned but was precluded from earning as a result of the employer's alleged wrongful termination because the purpose of General Statutes § 31-72 is remedial, the statute must be liberally construed in favor of those persons whom the legislature intended to benefit, and the appellate courts recognize actions brought by employees seeking compensation for future wages they would have earned but for their wrongful termination. Accordingly, DSL's motion to strike count three is denied.

2000 WL 1207269 (Conn.Super.), 27 Conn. L. Rptr. 643

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
**(Cite as: 1998 WL 57767 (Conn.Super.))**
<KeyCite History>
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Deborah A. **KALANQUIN,**
v.
COMMISSION HUMAN RIGHTS & OPPORTUNITIES.

No. CV 970567909.

Feb. 3, 1998.

MEMORANDUM OF DECISION

DiPENTIMA, J.

**\*1** The plaintiff Deborah A. Kalanquin appeals the dismissal by the defendant Commission on Human Rights & Opportunities (Commission) of her complaint of discrimination against her employer Heublein, Inc. Upon motion, Heublein was allowed to intervene as a defendant in this appeal on July 28, 1997. The appeal was brought pursuant to General Statutes § 46a-94a.

On June 10, 1996, the plaintiff filed her complaint with the CHRO alleging that Heublein gave her a poor evaluation, harassed her and did not provide her reasonable accommodation in part because of her physical disability and mental disorder in violation of General Statutes §§ 46a-58(a), 46a-60(a)(1), Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000e, the Civil Rights Act of 1991 and American With Disabilities Act, 42 U.S.C. 12101 et seq. On July 8, 1996, the plaintiff filed an amended complaint adding allegations of discrimination and harassment and a claim of constructive discharge. On July 30, 1996, the plaintiff requested that the CHRO default Heublein for failing to answer the interrogators in Schedule A. On August 16, 1996, Heublein filed a response to the complaint and to Schedule A. On October 7, 1996, the CHRO dismissed the plaintiff's complaint as amended on the ground that there was no

reasonable possibility that further investigation would result in a finding of reasonable cause. General Statutes § 46a-83(b). On October 22, 1996, the plaintiff filed a request for reconsideration, which was denied on December 20, 1996. This appeal followed on January 31, 1997.

The defendant Heublein argues that the plaintiff's appeal is untimely because it was filed more than forty-five days after the § 46a-83(b) dismissal. General Statutes § 4-183(c). As this attacks the claim of subject matter jurisdiction, the court must address it prior to considering the merits of the plaintiff's appeal. *Figueroa v. C & S Ball Bearing,* 237 Conn. 1, 4, 675 A.2d 845 (1997); *Glastonbury Volunteer Ambulance Association, Inc. v. FOIC,* 227 Conn. 848, 633 A.2d 305 (1963). The defendant CHRO joins the plaintiff in opposing to this jurisdictional attack. The facts are not in dispute.

The plaintiff filed a request for reconsideration within fifteen days of the initial dismissal but did not file an appeal until after the request for reconsideration was denied. The appeal was filed within forty-five days of the denial of reconsideration. General Statutes § 46a-83a reads,

Right of appeal by complainant.

If a complaint is dismissed pursuant to subsection (b) or (c) of section 46a-83, or if a reconsideration of a dismissal as provided in subsection (e) of section 46a-83 is rejected, the complainant shall have a right of appeal pursuant to section 46a-94a. The provisions of subsection (j) of section 4-183 shall apply to any appeal pursuant to this section.

The language of the statute clearly authorizes this appeal. Accordingly, the court declines to dismiss the appeal for lack of subject matter jurisdiction.

**\*2** In her appeal, the plaintiff raises a number of issues. The first group of issues are categorized as procedural irregularities. The remaining issues concern the correctness of the CHRO's findings and conclusions in its final decisions.

The scope of the court's review of an agency's decision is very limited. Under General Statutes § 4-183(j), "the court shall not substitute its

judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are ... clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record."

Furthermore, "[j]udicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally, or in abuse of discretion." *Conn. Light & Power Co. v. Dept. of Public Utility Control,* 219 Conn. 51, 57-58, 591 A.2d 1231 (1991). "Ultimately, '[t]he question is not whether the trial court would have reached the same conclusion but whether the record before the [agency] supports the action taken.' " (Citations omitted.) *Miko v. Commission on Human Rights & Opportunities,* 220 Conn. 192, 201, 596 A.2d 396 (1991).

The plaintiff raises four procedural violations which she claims affect the validity of the CHRO decisions. In order to obtain a reversal of the agency decision on this basis, the plaintiff must demonstrate prejudice. "Even a demonstration of procedural irregularities would not require us to set aside the board's decision in the absence of a showing of material prejudice. *Jutkowitz v. Dept. of Health Services,* 220 Conn. 86, 97, 596 A.2d 374 (1991); *Murach v. Planning & Zoning Commission,* 196 Conn. 192, 205, 491 A.2d 1058 (1985)." *Anziano v. Board of Police Commissioners,* 229 Conn. 703, 713, 643 A.2d 865 (1994).

As to the claimed procedural irregularities, the court looks first to the statute setting forth the procedure to be followed by the CHRO in processing a complaint. Under General Statutes (Rev. to 1994) § 46a-83(b),

Within ninety days of the filing of a complaint, the executive director or his designee shall review the file. The review shall include the complaint, the respondent's answer and the responses to the commission's requests for information, if any, and the complainant's comments, if any, to the respondent's answer and information responses. If the executive director or his designee determines that the complaint fails to state a claim for relief or is frivolous on its face, or there is no reasonable possibility that investigating the complaint will result in a finding of reasonable cause, the complaint shall be dismissed.

**\*3** The plaintiff first argues that the dismissal of October 7, 1996 was untimely because it was issued more than ninety days from the filing of the complaint. The plaintiff filed an amended complaint adding a new claim on July 8, 1996. Heublein filed its answer pursuant to permission of the CHRO on August 16, 1996. The CHRO's dismissal was within ninety days of the filing of the amended complaint. See Public Act 96-241 § 2(b). Therefore, the dismissal was not untimely. Finally, the plaintiff has demonstrated no material prejudice as a result of the alleged violation. *Anziano v. Board of Police Commissioners, supra,* 229 Conn. 713.

The plaintiff next argues that the CHRO erred in not granting its motions for default. The court has carefully reviewed the record and finds only one motion for default: the July 30, 1996 request for default made pursuant to § 46a-54-73 of the Regulations of Connecticut State Agencies as to interrogatories. (Return of Record (ROR), 267.) That motion was denied by the CHRO in its letter to Heublein on August 7, 1996. (ROR, 360B.) Responses to the interrogatories were filed on August 16, 1996. On August 29, 1996, the plaintiff renewed her motion for default as to the interrogatories, claiming that many were left unanswered. As noted by this court (McWeeny, J.) in *Truglia v. Connecticut Commission on Human Rights & Opportunities,* Superior Court, judicial district of Hartford/New Britain at Hartford, Doc. No. 554068 (April 7, 1997):

General Statutes § 46a-83(i) provides that the CHRO "may" default respondents who fail to answer under oath or who fail to answer interrogatories. Therefore, the decision whether to default parties is committed to agency discretion. An agency's discretionary determinations are to be accorded considerable weight by the courts. *Board of Administration v. Bridgeport Community Television Co.,* 168 Conn. 294, 298-99, 362 A.2d 529 (1975); *Connecticut Hospital Assn. v. Commission on Hospitals and Health Care,* 200 Conn. 133, 140, 509 A.2d 1050 (1986); *State Medical Society v. Board of Examiners in Podiatry,* 208 Conn. 709, 777, 546 A.2d 830 (1988). Furthermore, since an employer,

through its attorney, did file an answer under oath and did answer interrogatories, the CHRO did not abuse its discretion in accepting these answers and not defaulting the individual partners of the employer partnership for not answering individually.

Here, Heublein provided responses to the interrogatories after the denial of the request for default.  The court will not disturb this ruling.

The third procedural error raised is that the CHRO should have defaulted Heublein for failing to plead to more than one half of the plaintiff's allegations in her complaint.    In fact, Heublein did respond to these allegations by alleging that the claims were untimely in light of the 180-day period for CHRO claims under § 46a-82(e).  (ROR, 313-320.)   It erroneously used the date of December 13, 1995 as a cutoff date when, under § 46a-54-34 of the Regulations of Connecticut State Agencies, it should have been December 12, 1995.   The plaintiff raised the issue of the miscalculation of the 180 day period late in this appeal and did not raise it at all before the agency. *Levinson v. Board of Chiropractic Examiners,* 211 Conn. 508, 536, 560 A.2d 403 (1989);    *Jutkowitz v. Department of Health Services,* 220 Conn. 86, 95, 596 A.2d 374 (1991).   The discretion allowed to the agency in determining whether to grant a default for failure to plead is "accorded considerable weight."  Accordingly, the court rejects this claim.

**\*4** Finally, the plaintiff argues that the CHRO should have granted the plaintiff's motion to strike Heublein's position letter because the letter contained legal argument.    The position letter was filed on August 16, 1996. (ROR, 303-10.)  The plaintiff had the opportunity to respond to that letter.  There is no statutory provision restricting the parties to a CHRO proceeding from submitting legal argument even during a merit assessment review.  Clearly, a large part of the CHRO's role at this stage is to determine legal issues as well as factual.   The court finds no merit in this argument.

In addition to the specific procedural irregularities, the plaintiff also claims that the CHRO failed to perform a thorough investigation as required under *Adriani v. Commission on Human Rights & Opportunities,* 220 Conn. 307, 596 A.2d 426 (1991), and *Ierardi v. Commission on Human Rights & Opportunities,* 15 Conn.App. 569, 546 A.2d 870, cert. denied, 209 Conn. 813,

550 A.2d 1082 (1988).    As noted by the defendants in their briefs, subsequent to those decisions, General Statutes § 46a-83 was amended in 1994 to provide for a merit assessment review in lieu of an investigation.   It is the amended statute that governs this case, and accordingly, the court rejects this claim.

The court now turns to the findings of the CHRO in its decisions.    The plaintiff claims that the CHRO's findings that 1) it had no jurisdiction, 2) there was no pattern of discriminatory conduct, 3) Heublein had no duty to accommodate the plaintiff for her disability, 4) she was not constructively discharged, 5) that the plaintiff had no retaliation claim and 6) Heublein's reasons for its actions were not discriminatory, were erroneous as a matter of law and arbitrary based on the evidence in the record.

The record reflects the following facts.    The plaintiff was employed by Heublein from 1980 through 1986.    In July 1990, she returned to Heublein as temporary employee until May 1991 when she was assigned to a full time position in the legal department with Attorney Cecily Isbell as her immediate supervisor.  On December 13, 1995, the plaintiff suffered a severe anxiety attack and left work.   She has been on disability leave since that day until June 1996 when she was placed on family/medical leave while her long term disability benefit application was pending.

In her complaint, the plaintiff alleges that beginning in 1992 she was subjected to an "increasingly hostile work environment" by Isbell.  She further alleges that although she informed Heublein of the hostility and requested a transfer, Heublein did nothing.   She alleges that in April 1994, Isbell threatened her continued employment in an unprovoked outburst.   At that time the plaintiff was diagnosed with fibromyalgia and anxiety disorder "caused by Isbell's hostile work conditions." (ROR, 102.)   From January 1995 through May 1995, the plaintiff took short term disability leave.   Upon her return in May 1995, the hostile work environment continued.  She requested a transfer of assignments.  While not every allegation is dated, the court infers that all of these events took place prior to December 12, 1995.   On December 12, 1995, the plaintiff received her performance appraisal, which described her performance as "inconsistent" and

in some areas "unsatisfactory." This was in "complete contrast" to her prior appraisals.

**\*5** Since December 13, 1995, her last day at work, the plaintiff alleges that she requested another position from Heublein, and none was offered. When her short term disability benefits expired, she applied for long term disability benefits and again requested another position. Heublein did not respond and placed her on family/medical leave. The plaintiff alleges that there was available job openings that were filled by outside persons. The plaintiff claims that this conduct by Heublein is further harassment and that by failing to transfer her to another position even though Heublein knows of the hostile work environment under Isbell, Heublein has constructively discharged her. (ROR, 105.)

Heublein alleged in response that most of the alleged acts of harassment that occurred prior to December 13, 1995 are untimely under § 46a-82. As to those acts after December 13, 1995, Heublein noted that December 13, 1995 was the last day of plaintiff's active employment, that she had been on paid disability leave until June 14, 1996, and, that as of the CHRO proceeding, she has been on Family and Medical Leave (FMLA). The plaintiff's doctors stated that during this period she was totally disabled and will be so for an undetermined period of time. As to the claim of constructive discharge, Heublein notes that she has not resigned and remains on FMLA. (ROR, 303-360.)

"In determining whether a complaint of discrimination in employment is supported by reasonable cause, the CHRO is not limited to determining whether the complainant can make a prima facie case. Rather, the CHRO must look at the preliminary information as a whole in assessing whether reasonable cause, as defined in General Statutes § 46a-83(b) is or is not present." *Cohen v. Connecticut Commission on Human Rights & Opportunities,* Superior Court, judicial district of Hartford/New Britain at Hartford, Docket No. 549621 (March 1, 1996) (Hodgson, J.).

The CHRO made the following statements in the notice of merit assessment dismissal:

> You have stated that you were harassed, given a poor evaluation, not reasonably accommodated and constructively discharged by [Heublein] based on your physical disability.

The issues of harassment mentioned in your complaint are untimely. That is the incidents of harassment have taken place more than 180 days prior to your filing of the complaint, thereby making such issue nonjurisdictional for review by the Commission. You then state that you were given a poor evaluation on December 13, 1995. Furthermore, your complaint states not that you were harassed due to your disability, but rather, that *you became disabled due to the alleged harassment.*

(ROR, 7.) (Emphasis in original.)

Then, in its decision rejecting the reconsideration, the CHRO commented in part as follows:

4. The complainant stated that the incidents of harassment which occurred more than 180 days prior to the filing of the complaint were the cause of her disability, not because of her disability. Complainant's doctor stated that the complainant's onset of disability occurred on December 14, 1995. Since the harassment was not based upon a protected class basis, the Commission has no jurisdiction to investigate it. In a like manner, the Commission cannot investigate every employee's termination, but only those which are alleged to be based upon a protected class basis.

**\*6** (ROR, 5.)

While the plaintiff argues that the CHRO's findings that it had no jurisdiction were contrary to the law and evidence, the court finds otherwise. The plaintiff claims that the CHRO incorrectly found she was not within the protected class and did not apply the pattern of discriminatory conduct theory to the acts occurring outside the 180-day period. As to the former claim, there is substantial evidence to support the finding that the plaintiff's disability as of December 14, 1995 was total. Accordingly, she would not be a "qualified individual with a disability" under the Americans with Disabilities Act to support a discrimination claim subsequent to December 14, 1995. As to the claim that the CHRO should not have ignored those claims outside the 180 day period under a pattern of discriminatory conduct theory, the record shows that the CHRO did look at the merits of those claims of discriminatory acts prior to December 13, 1995, including the poor performance review:

When you returned to work, your work environment had not changed, and you mentioned that you believe you were given this poor evaluation because you complained of harassing conduct after your return. However, the information in the investigative file shows that on December 14, 1996(sic), just one day after you received your evaluation, your physician requested that you be approved for leave because your symptoms were "disabling in terms of performing the duties and responsibilities of [your] job." In light of this request from your physician, it shows that respondent was appropriate in issuing a poor evaluation because when they believed you to be released to perform the essential functions of your position you were, in fact, not capable. They had no way of knowing that your performance level decreased due to the existence of your disability [sic] because you were released to return to work. Respondent reasonably assumed you were just not meeting the expected standards of performance.

(ROR, 37.) The record supports the CHRO's finding that the alleged harassment was not because of the plaintiff's disability. As to the performance review, the record shows there is evidence to support the CHRO's finding.

The remaining claims of error are similarly disposed of through a review of the record. As noted earlier, this court's review is limited and the CHRO's decision "must be sustained if an examination of the record discloses evidence that supports any one of the reasons given." *Huck v. Inland Wetlands & Watercourses Agency,* 203 Conn. 525, 539-40, 525 A.2d 940 (1987). Further, "the credibility of the witnesses and the determination of factual issues are matters within the province of the administrative agency." (Citations omitted; internal quotation marks omitted.) *Id.*, 540-41, 525 A.2d 940.

Here, there was evidence to support the finding there was no duty to accommodate because the plaintiff was totally disabled. (ROR, 347, 349, 351, 359.) There is also evidence to support the CHRO's finding that the plaintiff was not constructively discharged because she remained on FMLA leave and did not submit a resignation. The record contains evidence that, as of the filing of the amended complaint, the plaintiff was on FMLA and applying for long term disability benefits (ROR, 365). Finally, the complaint to the CHRO did not raise a retaliation claim as to

the application for long term disability. While there are specific statutory violations alleged in her complaint, the provision as to retaliation is not. General Statutes § 46a-60(a)(4). Accordingly, the CHRO was correct in not addressing it. See *West Hartford v. Commission on Human Rights & Opportunities,* 176 Conn. 291, 296-97, 407 A.2d 964 (1978).

**\*7** The plaintiff's final claim is that the CHRO improperly dismissed her complaint by performing an adjudicative function in deciding that Heublein's motives were nondiscriminatory. While the plaintiff cites *Adriani v. Commission on Human Rights & Opportunities, supra,* 220 Conn. 322, note 14 (1991), in support of the argument, the court does not read *Adriani* to say that CHRO cannot look to the reasons proffered by Heublein during this preliminary stage to see if a discriminatory motive played a role in its treatment of the plaintiff as an employee. See *Ierardi v. Commission on Human Rights & Opportunities, supra,* 15 Conn.App. 579-81.

The plaintiff has not met her burden under General Statutes § 4-183(j) to show that the actions of the CHRO in dismissing her complaint under § 46a- 83(b) were procedurally or substantively flawed.

The appeal is dismissed.

1998 WL 57767 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in A.2d
**(Cite as: 2002 WL 1009809 (Conn.Super.))**
<KeyCite Citations>
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

**FAIRFIELD FINANCIAL** MORTGAGE GROUP, INC.,
v.
Jeffrey **SALAZAR.**

No. CV000339752S.

April 23, 2002.

MORAGHAN, J.T.R.

*1 The defendant, Jeffrey **Salazar (**hereinafter "**Salazar"),** has filed a motion to strike all four counts of the plaintiff, **Fairfield Financial** Mortgage Group, Inc.'s (hereinafter "**Fairfield"),** complaint. On June 7, 2000, Fairfield filed an application for prejudgment remedies which was granted on June 12, 2000. It subsequently filed a complaint on June 27, 2000, in which it alleges that Salazar was employed by it and that he (Salazar) had sold rights to a funding project that he was working on while employed with the plaintiff. It also alleges that he earned five hundred thousand ($500,000) dollars as a result of this sale. Fairfield also asserts that Salazar refused to deliver three hundred thousand ($300,000) dollars of the sale proceeds to it, which nonpayment allegedly was in breach of the memorandum of employment between the parties. Based on these allegations, the plaintiff sets forth causes of action sounding in breach of contract, unjust enrichment, misappropriation of corporate opportunity, and breach of good faith and fair dealing in counts one through four, respectively. [FN1]

> FN1. On August 14, 2000, the court, Moraghan, J., heard a motion to consolidate the present case with a case entitled *US Financial Group, Inc. v. Salazar,* Superior Court, judicial district of Danbury, Docket No. 339753 and ordered that the cases be companionized only.

"The purpose of a motion to strike is to contest ... the legal sufficiency of the allegations of any [complaint] ... to state a claim upon which relief can be granted." (Internal quotation marks omitted.) *Peter-Michael, Inc. v. Sea Shell Associates,* 244 Conn. 269, 270 (1998). "[F]or the purpose of a motion to strike, the moving party admits all facts well pleaded." *RK Constructors, Inc. v. Fusco Corp.,* 231 Conn. 381, 383 n. 2 (1994). "The court must construe the facts in the complaint most favorably to the plaintiff." (Internal quotation marks omitted.) *Faulkner v. United Technologies Corp.,* 240 Conn. 576, 580 (1997). "A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." *Novametrix Medical Systems, Inc. v. BOC Group, Inc.,* 224 Conn. 210, 215 (1992).

Count one of the complaint alleges that Salazar breached his employment contract with the plaintiff by selling the rights to the funding project and not delivering three hundred thousand ($300,000) dollars of the proceeds to it (Fairfield). The plaintiff attached a document to the complaint that it alleges is a "memorandum setting forth the terms of employment." "The key elements of a breach of contract action are: (1) the formation of an agreement; (2) performance by one party; (3) breach of the agreement by the other party and (4) damages." (Internal quotation marks omitted.) *Ambrogio v. Beaver Road Associates,* Superior Court, judicial district of New Britain, Docket No. 475509 (November 16, 2000) (Shapiro, J.); see also *Eagle Hill Southport School, Inc. v. Roberts,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. 363604 (August 24, 2000) (Melville, J.).

In the present case, Fairfield claims that the defendant was its employee; that during his employment, Salazar was contacted by RDC Funding Corporation to provide funding or leverage funding for a project in the amount of $2.5 million for a $100 million note issue; that the defendant contacted Merrydale Corporation to provide the funding; that prior to the completion of the project, Salazar sold the rights to the project to Merrydale; and that he earned a five hundred thousand ($500,000) dollar fee and has neglected to deliver three hundred thousand ($300,000) dollar (or 60 percent) to Fairfield in

breach of the memorandum of employment. The plaintiff does not allege that it performed its obligations under the contract. Accordingly, it does not sufficiently allege the necessary elements of a breach of contract claim and, consequently, the motion to strike count one is granted.

**\*2** Count two of the complaint sets forth a claim for unjust enrichment. The plaintiff incorporates the allegations from count one into the second count and asserts that these allegations constitute unjust enrichment. "Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff ... The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment." (Citation omitted.) *Gagne v. Vaccaro,* 255 Conn. 390, 409 (2001).

In the present case, Fairfield fails to allege that Salazar benefited from some conduct by it or that he unjustly failed to pay it for the benefits it conferred on him. " 'The burden rests on the plaintiff to allege a recognizable cause of action, and it is not sufficient that a complaint refer to a basis of liability by some distinctive name ... the complainant is required to set forth facts upon the basis of which, if true, he may be able to establish in law a right to relief, for, unless that is done, the pleading is [subject to a motion to strike].' " *Turner Construction Co. v. Eppoliti, Inc.,* Superior Court, judicial district of Danbury, Docket No. 323118 (January 8, 1997) (Moraghan, J.), quoting *Research Associates, Inc. v. New Haven Redevelopment Agency,* 157 Conn. 587, 588-89 (1968). Again, Fairfield has failed to sufficiently plead a cause of action for unjust enrichment and the motion to strike count two is granted.

The third count of the complaint incorporates the allegations from count one and further alleges that those allegations constitute misappropriation of a corporate opportunity. "To prevail on a claim of usurpation [of a corporate opportunity], we observed, in *Katz Corp. v. T.H. Canty & Co.,* 168 Conn. 201, 207-08, 362 A.2d 975 (1975), that a plaintiff bears the burden of establishing: (1) a fiduciary relationship between the corporation

and the alleged wrongdoers; and (2) the existence of a corporate opportunity." *Murphy v. Wakelee,* 247 Conn. 396, 404 (1998).

In determining whether a cause of action for usurpation of a corporate opportunity exists, the Supreme Court held that the dominant inquiry is whether the corporate opportunity at issue falls within the corporation's avowed business purpose. The factors listed by the Supreme Court to determine whether the business opportunity was one in which the corporation had an interest are: "(1) whether the business opportunity was one in which the complaining corporation had an interest or an expectancy growing out of an existing contractual right; (2) whether there was a close relationship between the opportunity and the corporation's business purposes and current activities; and (3) whether the business areas contemplated by the opportunity were readily adaptable to the corporation's existing business, in light of its fundamental knowledge, practical experience, facilities, equipment, and personnel." *Ostrowski v. Avery,* 243 Conn. 355-67 (1997).

**\*3** In the present case, Fairfield merely alleges that Salazar was its employee. It does not assert that a fiduciary relationship existed between the parties or that a corporate opportunity existed. It also fails to recite that the opportunity fell within its avowed business purpose or that it was ready and willing to take the opportunity. Once again, Fairfield has failed to sufficiently plead a claim for usurpation of business opportunity and the motion to strike count three is granted.

In the fourth count, Fairfield asserts a cause of action for breach of good faith and fair dealing. It, seriatim, incorporates the allegations of count one and does not make any further factual allegations. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." (Internal quotation marks omitted.) *Gupta v. New Britain General Hospital,* 239 Conn. 574, 598 (1996). "[A]n action for breach of the covenant of good faith and fair dealing requires proof of three essential elements, which [a] plaintiff must duly plead: first, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those

benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits it reasonably expected to receive under the contract, the defendant was acting in bad faith." (Internal quotation marks omitted.) *Troy v. Precision Computer,* Superior Court, judicial district of Litchfield at Litchfield, Docket No. 082592 (September 19, 2001) (Agati, J.). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive ... Bad faith means more than mere negligence; it involves a dishonest purpose." (Citation omitted; internal quotation marks omitted.) *Habetz v. Condon,* 224 Conn. 231, 237 (1992).

 In the present case, Fairfield has failed to allege any factual basis for a claim of bad faith. Salazar correctly argues that *Meehan v. The Press, Inc.,* Superior Court, judicial district of Danbury, Docket No. 321002 (February 22, 1996) (Moraghan, J.), is on point. There, this court granted the defendant's motion to strike the plaintiff's count sounding in breach of implied covenant of good faith and fair dealing where the plaintiff merely incorporated allegations from a prior breach of contract count and further alleged that the defendant's acts were deliberate, wanton and willful. This court stated: The plaintiff has failed to allege improper motive or conduct by the defendants which support a claim for breach of the implied covenant of good faith and fair dealing. It continued by saying that this court has previously stricken claims of breach of implied covenant of good faith and fair dealing where there is an insufficient factual predicate to support such claims. While other courts have allowed similar claims to stand, in those cases there has been some allegation in the pleadings-- other than mere incorporation of all other paragraphs of the complaint--that supports a claim of breach of implied covenant of good faith and fair dealing. Thus, in cases which have allowed claims of breach of an implied covenant of good faith and fair dealing, there have been allegations beyond simple breach of contract that support a breach of the implied covenant.

 **\*4** In this instance, Fairfield merely incorporated the allegations from the breach of contract count without alleging any bad faith on the part of Salazar. Accordingly, the plaintiff has failed to

allege facts legally sufficient to constitute an action for breach of implied covenant of good faith and fair dealing and the defendant's motion to strike count four is granted.

 Based on the foregoing analysis, the motion to strike all four counts of the complaint is, accordingly, granted.

2002 WL 1009809 (Conn.Super.)

END OF DOCUMENT