**UNITED STATES DISTRICT COURT**
**for the**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ERNESTO GALARZA** | : | |
| | : | **CIVIL ACTION NO.** |
| | : | |
| **v.** | : | **3:01 CV 986 (AWT)** |
| | : | |
| | : | **May 24, 2004** |
| **LOMBARD FORD and ROBERT** | : | |
| **LOMBARD** | : | |

**LOCAL RULE 56(A)2 STATEMENT**

Ernesto Galarza, Plaintiff herein, provides his Local Rule 56(a)2 Statement

responding to the assertions of Defendants and states as follows:

1.      The founding of the company is admitted, but the evaluation of whether

the dealership was "successfully operated" is a material issue.   In the initial job

interview, Mr. Lombard discussed numerous problems the dealership was experiencing,

including the need to make personnel changes, the absence of a selling system within

the dealership, the absence of a marketing system and the failure to install internals

controls within the dealership. Galarza affidavit, ¶¶ 6, 15-21; Defendants' Exhibit F (the

"Business Plan").  Lombard expressed a need to increase sales and profitability and to

increase accountability for staff. Galarza deposition, pp. 24-5.[1]

---

[1] The Galarza deposition is Exhibit P to Defendants' Motion.

2.      Denied.  The relevance of happy customers two and three years before

Plaintiff was hired is doubtful.  Because of problems at the dealership (as mentioned

above), new management was needed and Plaintiff was hired.  When Plaintiff arrived at

the dealership in 1999, Mr. and Mrs. Lombard had dismissed any chance the dealership

might have for earning the 1999 President's Award.  The Lombards told Plaintiff that it

would be a "miracle" if they won that award. Galarza affidavit, ¶33.  For that reason,

they were shocked when the President's Award was issued to them.  Lombard Ford did

not achieve the same level of success in 2000 and 2001  - it did not earn the President's

Award in those years. Galarza affidavit, ¶35.  Whatever lesser recognition Lombard

Ford might have received in other years, Plaintiff's efforts earned them the top award

during his tenure.

Ford Motor Company described the import of the 1999 President's Award as

follows:

"These Ford and Lincoln Mercury dealers were **recognized by their customers

for outstanding leadership in sales, service and overall ownership

experience**.  Ford Motor Company is proud to salute them with our 1999

President's Award."

(Emphasis supplied) Attachment 2 to the Galarza Affidavit.   The award recognizes the

customer satisfaction of Lombard Ford's customers during Plaintiff's tenure.

The "successful" boat dealership claim is disputed.  During his tenure, Plaintiff

was told by the bookkeeper that expenses of the boat dealership were being buried in

the dealership has since closed due to poor sales. Galarza affidavit, ¶46.   Both Mr.

Lombard and the bookkeeper told Plaintiff that the boat dealership was 'in trouble.'

**Local Rule 56(a)2 Statement - Page 2**

Galarza deposition, p. 123. During Plaintiff's tenure, Mr. Lombard ran many of the expenses of the boat dealership through the books of the auto dealership because the boat company could not support them.

With respect to the contention that Lombard presented an "honest and friendly dealership" environment, that claim is disputed. Mr. Lombard secretly monitored fax transmissions and their phone numbers in an effort to discover what insider of the dealership was communicating with Litchfield Ford.  Mr. Lombard suspected Dave Bettigol of leaking confidential information to Litchfield Ford; he routinely referred to Mr. Bettigol as the "hebe" (because of his Jewish heritage).  Galarza affidavit, ¶16.  Mr. Lombard employed technical specialists to 'sweep' the dealership because he suspected electronic surveillance by Litchfield Ford. Lombard monitored fax transmissions looking for communications to Litchfield Ford.  Lombard's deep concerns, for which he never had proof, was not conducive to a "friendly" environment.

With respect to the self attributed quality of honesty, it is disputed.  In one circumstance, Don Hiller sold a pre-owned Corvette, for which he was entitled to receive a significant commission.  Mr. Lombard cheated him on the commission, and forced Mr. Hiller to resign. In a separate incident, Mr. Lombard quoted a mechanic a certain price for a used vehicle.  Later, Mr. Lombard unilaterally increased the price.  When the mechanic questioned the change in price, Mr. Lombard berated him in such a manner that the mechanic resigned.  Plaintiff witnessed Mr. Lombard summarily terminate employees with nearly two decades of employment. Galarza affidavit, ¶80. Lombard would advertise prizes to lure customers, and would then give out the prizes to friends. Galarza affidavit, ¶29.  Lombard has misrepresented the termination of Drake Viscone,

concealing his own decision to fire him.  Galarza affidavit, ¶¶40-41.   Lombard's

assertion of honesty is false.

3.      Admitted. During the interview process, Mr. Lombard indicated that he

wanted to transition into the boat business as his business focus. Galarza affidavit, ¶5.

Mr. Lombard "said he did not want to stay in the car business forever, that somewhere

down the line he was looking for somebody to lessen the load because he wanted to

sell boats.  And that person would get a chance to buy into the [car] dealership . . ."

Galarza deposition, p. 112.  Mr. and Mrs. Lombard indicated that Mr. Lombard had

recently been hospitalized and that he wanted to turn his focus to the boat dealership.

Galarza affidavit, ¶5.  Mr. Lombard also indicated that he wanted to hire a person from

outside the area, one, he said,  who wasn't "tainted" by the local people, i.e. might not

be engaged by Litchfield Ford to spy on his operation.   Galarza affidavit, ¶6.  Mr.

Lombard indicated that Mr. Galarza demonstrated a similar strong work ethic.

4.      Admitted.

5.      Admitted. Mr. and Mrs. Lombard both interviewed the Plaintiff.

6.      Denied.  In each of the three interviews Plaintiff had with Mr. Lombard, Mr.

Lombard indicated a desire to "clean house," e.g. replace existing staff. Galarza

affidavit, ¶¶6, 15-16, 37.  He indicated that he wanted to hire a person from outside the

area, one, he said,  who wasn't "tainted" by the local people, i.e. might not be engaged

by Litchfield Ford to spy on his operation.   Galarza affidavit, ¶6.  Mr. Lombard

disguised Mr. Galarza's identity when he toured the dealership because Mr. Lombard

intended to fire Dave Bettigol, who he suspected of leaking confidential information to

Lombard Ford's competitor, Litchfield Ford. Galarza affidavit, ¶6, 15-16.  He also

indicated that Frederica Irish, John Dagata and all the sales representatives were lazy and untrustworthy; Mr. Lombard suspected many of them of conspiring with Litchfield Ford. Mr. Lombard also suspected some employees of theft. Galarza affidavit, ¶¶15-17. Thus, the dealership would be different, because Mr. Lombard wanted the entire dealership to be changed.

Defendants' reference to Plaintiff's deposition transcript is misleading. While it does reference a smaller employee applicant pool in Winsted, Mr. Galarza does not testify to a 'strong leader', 'gentler' ways, or compare to what he was used to. Galarza depo. pps. 148-9. Plaintiff does testify that the applicant pool was further reduced because "the store had a reputation. It was very difficult to get people to work there." *Id.* at 149.

7.    Admitted.

8.    Denied as to the objectives of the dealership. Contrary to the representations, Lombard Ford's goal was not profitability, but increased sales. Galarza affidavit, ¶18-21; Business Plan. Mr. Lombard was primarily interested in market penetration and expanding the Lombard name. At the time of the interviews, Lombard Ford was averaging sales of 60 vehicles per month. Plaintiff suggested that the vehicle sales number be increase to 80 vehicles per month. Galarza affidavit, ¶19. Later, after Plaintiff had been successful, Lombard increased the goal to 100 vehicles per month. Galarza affidavit, ¶20.

Increased sales would not, however, maintain the same gross margins, particularly across the different departments of the dealership. Mr. Lombard wanted to emphasize new vehicle sales, which would yield lower profits. Galarza affidavit, ¶20.

Those low profits could be balanced by the sales of used vehicles, which traditionally carry higher gross margins. Mr. Lombard was particularly concerned with the new car and truck business he lost to Litchfield Ford in the previous two years, and he stressed repeatedly, in every interview,  that such recovery was the primary goal. Galarza affidavit, ¶6.  The business objective was exactly the opposite of what Defendants now contend.

Even with the increased sales, however, the 1984 Report demonstrates that operating profit for the dealership significantly exceeded its peer group of dealers, Galarza affidavit, ¶32.  Indeed, the dealership's operating profit, according to the figures compiled by Ford Motor Company, was 57% above its peer group average.

9.    Denied.  Plaintiff denies that Mr. Lombard was aware of Plaintiff's nationality until long after he was hired. Galarza affidavit, ¶22-26; Kathleen Galarza affidavit, ¶11.   During the three interviews, Mr. Lombard repeatedly stated that he was happy to hire a "guinea wop." *Id.*   Plaintiff did not "openly discuss" his nationality with Mr. Lombard because he feared that it would jeopardize his potential employment. When Mr. Lombard introduced Plaintiff to  Mr. Fercodini, John Dagata, Tom Spinella, he introduced Plaintiff as his "new guinea wop."  Galarza affidavit, ¶22.

10.    Admitted.  Plaintiff had requested a contract, because acceptance of the position required him to move away from his business contacts and history and uproot his family.  Mr. Lombard said his 'word was his bond' and that he would only hire Plaintiff for a long term situation.  Galarza affidavit, ¶8.

11.    Admitted.  Plaintiff not only represented that he was a hard worker, but Mr. Lombard contacted his previous employers who verified and confirmed his

representations concerning his work ethic.  Galarza affidavit, ¶9.  Mr. Lombard spoke

with his supervisor at Rittenhouse-Kerr Lincoln/Mercury, who portrayed Plaintiff as an

excellent worker, always on time, never called in sick and worked hard and long hours.

*Id.*

12.     Denied as to Defendants' explanation of the oral contract of employment.

Plaintiff requested a written contract because he was uprooting his family and

abandoning his business contacts in New Jersey.  Mr. Lombard did not want a written

contract, indicating that (1) his word was his bond and (2) he would not hire Plaintiff if a

long term relationship was not intended. Galarza affidavit, ¶¶8, 10 & 12.  Mr. Lombard

told Plaintiff that if he accepted his offer, Plaintiff would have a job for life,  eventually

leading to a partnership or even full ownership. Galarza affidavit, ¶¶7,10, & 12; Kathleen

Galarza affidavit ¶9.   Plaintiff would not accept a position on a "hope and a prayer"

basis. Galarza affidavit, ¶10.  Lastly, Mr. Lombard never referred to the employment

manual during the interviews and certainly never mentioned it in connection with the

terms of Plaintiff's employment. Galarza affidavit, ¶13.  Mr. Lombard indicated that he

was looking for someone who wanted to take over the car dealership and that he would

give that person an opportunity to buy into the dealership "at a preferred rate and as a

partner".  Galarza depo. p. 112- 13.  Mr. Lombard repeated this proposal during the

third interview in Mrs. Galarza's presence. Kathleen Galarza affidavit. ¶9.

12     Admitted that Lombard was not interested in a written employment

contract, but deny that was related to the employees' manual. Galarza affidavit, ¶8, 10,

& 13. To the contrary, Lombard represented that "his word was his bond" and that he

would not solicit Plaintiff to leave New Jersey unless it was for a long term commitment.

Galarza affidavit, ¶8.

13.    Denied.  Lombard Ford retained a recruiter, Joseph Holstein, who, according to Rob Lombard, advised him that the average salary and compensation package for a general manager of a similarly situated dealership was $90,000.  Galarza affidavit, ¶11.   To convince Plaintiff to accept the lower salary, Mr. Lombard promised a greater salary and commission in the second year, suggesting that he wanted to increase the profitability of his boat dealership before he could agree to the higher compensation.  Galarza affidavit, ¶12.  The parties did agree to a bonus plan.  Lastly, Mr. Lombard suggested that Mr. Galarza look at the 'big picture', which included partial and potentially full ownership of the dealership.  *Id.*

14.    Denied that there was a "brief" mention of equity ownership.  In each of the three interviews, Lombard expressly promised Plaintiff an equity interest.  Galarza affidavit, ¶¶7 & 10.   It was a significant and pivotal issue, leading to Plaintiff's acceptance of Defendants' offer. Galarza affidavit, ¶7.

15.    Plaintiff admits that he began working for Lombard Ford in early April 1999, and denies the remaining assertions.  His tenure was quite successful, leading to the President's Award from Ford Motor Company.  Galarza affidavit, ¶¶27-35; and attached Dealers World June/July 2000 announcement.

Plaintiff worked exceptionally hard at the dealership, sacrificing family time and moving responsibilities to serve Defendants.  Galarza affidavit, ¶¶55-60; Kathleen Galarza affidavit, ¶¶9-12.

16.    The owner loyalty data does not support the claims made.  The data refers to former Ford customers, most of whom purchased their vehicles before Plaintiff came

to the dealership.  Galarza affidavit, ¶43.  More significantly, the 1999 President's Award

is presented by Ford Motor Company and described as follows:

> "These Ford and Lincoln Mercury dealers were **recognized by their customers
> for outstanding leadership in sales, service and overall ownership
> experience**.  Ford Motor Company is proud to salute them with our 1999
> President's Award."

(Emphasis supplied) Attachment 2 to the Galarza Affidavit.

With respect to the staff turnover, no employee was hired or terminated without

the approval and consent of Mr. Lombard during Plaintiff's tenure. Galarza affidavit,

¶36.  Frequently, Mr. Lombard would order someone to be fired, and Plaintiff was

assigned the job of conveying that message.  Galarza affidavit, ¶¶36-42. Virtually all

staff turnover involved Mr. Lombard's consent, if not initiation.

17.    Plaintiff denies that he was verbally abusive to employees.  Galarza

affidavit, ¶38.  To the contrary, Mr. Lombard was the volatile person who verbally

abused the employees. Galarza affidavit, ¶39.

18.    Denied. With respect to the staff turnover, no employee was hired or

terminated without the approval and consent of Mr. Lombard during Plaintiff's tenure.

Galarza affidavit, ¶36.

19.    Disputed.  The comparison of employee turnover to other years is

irrelevant since Lombard was involved in all terminations. Galarza affidavit, ¶36. More

significantly, Lombard hired Plaintiff specifically to "clean house" because he doubted

the loyalty and fidelity of his employees.  Galarza affidavit, ¶¶6, 15.

20.    Denied.  Mr. Lombard instructed Plaintiff to terminate Drake Vicone

because he was privately selling auto parts and using the dealership's telephones and parts facilities to do so. Galarza affidavit, ¶¶40-41. Lombard wanted Viscone fired for running another business during his work for the dealership.

21.    Denied.  The 1999 President's Award reflects high performance, including profitability 57% greater that its peer group.  Galarza affidavit, ¶32.

22.    Denied.  Lombard continued to control many of the expenses of the dealership, including advertising.  Galarza affidavit, ¶44-49.  Lombard personally negotiated and placed most of the advertising for the dealership. *Id.*  Further, Lombard's office manager regularly complained that the dealership's expenses were overstated because Lombard insisted on running the boat dealership's advertising costs through the dealership. Galarza affidavit, ¶46-7.

23.    Denied.  The significant improvement in the dealership's performance is reflected in the 1999 President's Award and the 1984 Report.  Plaintiff received a bonus for performance.  Galarza affidavit, ¶49.  Indeed, Defendants retained Plaintiff long enough so that the President's Award could be announced before firing Plaintiff; presumably, racial and ethnic conflict might preclude the award.  The Ford Dealers World magazine depicts a racially diverse group of President's Award winners.  See attachment to Galarza affidavit.  Through the beginning of 2000, Mr. Lombard regularly told Plaintiff that the dealership was exceeding his expectations in both volume and profit. Galarza affidavit, ¶48.  Only since Plaintiff asserted claims of racial and ethnic discrimination have Defendants criticized his performance.

24.    Denied.   Before he was hired, Plaintiff articulated his plan to improve training of the dealership employees.  Galarza affidavit, ¶52; Business Plan.  With each

new hire, Plaintiff spent significant time to train and educate the new employee. Galarza affidavit, ¶53.  Defendants never complained about training during Plaintiff's tenure.  Galarza affidavit, ¶54.

With respect to the new employee who had a DWI conviction, Lombard expressly stated that such a conviction did not disqualify him as a salesman because other salespersons had similar records.  Galarza affidavit, ¶42.

25.    Denied.   Before he was hired, Plaintiff articulated his plan to improve training of the dealership employees.  Galarza affidavit, ¶52; Business Plan.  With each new hire, Plaintiff spent significant time to train and educate the new employee. Galarza affidavit, ¶53.  Defendants never complained about training during Plaintiff's tenure.  Galarza affidavit, ¶54.  On some occasions, Mr. Lombard would sit in on part of the training. Galarza affidavit, ¶53.

26.    Denied.  Plaintiff took off two days for Thanksgiving, and one week after his first year.  Galarza affidavit, ¶55-60.  Otherwise, he worked six days per week. Plaintiff frequently worked 60 - 70 hour weeks.  The diaries upon which Defendants rely were prepared by Mrs. Lombard, who was not on the premises on a daily basis. Galarza affidavit, ¶55.  These records are incorrect.

27.    Denied. Under the Ford dealership agreement, Lombard Ford is not allowed to ship vehicles overseas.  Mr. Lombard specifically ordered Plaintiff to ship the vehicle to England. Galarza affidavit, ¶¶61-69. After Plaintiff reminded him that such a sale violated the dealership agreement, Mr. Lombard again instructed him to send the vehicle.  Mr. Lombard violated the same policy previously when he shipped a car to Puerto Rico. Plaintiff believes that actual dealer invoices sent from the factory clearly

state that these types of vehicles were for sale only in the United States and not. Plaintiff is uncertain as to whether there were mistakes with the use of temporary license plates, but to his knowledge the dealership received no complaints from the Connecticut Department of Motor Vehicles.

28.    Denied. Mr. Lombard installed a see-through window in the wall of Plaintiff's office and, after installation, Mr. Lombard requested Plaintiff to rearrange his office to make the computer screen less visible to those outside of the office. Galarza affidavit, ¶¶70-73. The computer was on Plaintiff's desk all day and was available to employees who needed to work on it. Plaintiff did not visit pornography sites and did not monitor what sites may have been accessed by other employees.

29.    Denied. There was never any employment 'counseling' as suggested. Galarza affidavit, ¶50.

30.    Denied, except for the fact that Plaintiff was fired before witnesses. While Plaintiff was on his only vacation from the dealership, Mr. Lombard received notification that the dealership had been awarded the President's Award from Ford Motor Company, the highest award bestowed on a dealership.  The award reflected the superior effort, and attendant results, of Plaintiff. Lombard took not only its computer, but a computer lent to the dealership by Plaintiff.  Plaintiff's computer was returned one week later.  Plaintiff was not provided any explanation for his termination. Galarza affidavit, ¶¶87, 89.

31.    Admits that Defendants refused to provide a recommendation as promised but denies that assertions concerning poor performance. Galarza affidavit, ¶88. Plaintiff made representations to prospective future employers based upon the information

contained in the 1984 Report issued by Ford based upon information supplied by the dealership.  Further, poor performance as suggested by Defendants would not have resulted in the President's Award.

32.    Denied that there was a 'reorganization', a post-termination label applied by Defendants to Plaintiff's termination to conceal illegal racial and ethnic discrimination. While Plaintiff may or may not have a designated General Manager, there must obviously be a person who manages the business.  When Mr. Lombard lost his boat dealership, he resumed his position as the full time manager at Lombard Ford.  Plaintiff asserts that the claimed reorganization was a pretext for discrimination.  Indeed, if Plaintiff's poor performance was the true basis for his termination, why would Defendants hide the truth and lie about elimination of a position?  Further, the mere elimination of a position would not necessitate having Plaintiff escorted to his desk and from the building.  Indeed, the claim of reorganization is contrary to the claims that Plaintiff was terminated for poor performance or pornography viewing.  Defendants present conflicting claims as to the reasons for termination.

33.    Admitted.

34.    Admitted that the CHRO claim was dismissed through the Merit Assessment Review process.  Plaintiff denies the conclusion asserted because there was no opportunity to present live evidence, to cross examine Defendants, to review documents in the sole possession of Defendants, to call rebuttal witnesses, and to otherwise conduct a bona fide adversarial hearing.   There was no basis for the CHRO to make any 'findings' and its suggestions of poor performance are contrary to the

interpretation of Ford Motor Company when it issued Lombard Ford its highest award for performance during Plaintiff's tenure.

35.     Contested.  While Defendants suggest that the CHRO and EEOC authorization was the result of some default or indifference by Plaintiff, in fact Plaintiff specifically requested that the agencies release their jurisdiction to allow the matter to proceed to suit.  The CHRO cannot award damages for emotional distress or attorneys fees, rendering it an inadequate forum for the resolution of all of Plaintiff's damages. See attached correspondence.

### Disputed issues of Material Fact

1.     Whether Lombard knew of Plaintiff's ethnicity, race and heritage before he hired Plaintiff as general manager.

2.     Whether Lombard believed that Plaintiff was of Italian ancestry when he hired Plaintiff.

3.     Whether the terms and conditions of Plaintiff's employment as general manager were materially altered and changed because Defendants learned of Plaintiff's true ethnicity.

4.     Whether Lombard continuously referred to Plaintiff as his "guinea wop" after he was hired. Galarza affidavit, ¶22.; Kathleen Galarza, ¶11.

5.     Whether Lombard Ford and Lombard discriminated against African-Americans and older women in intentional disregard of federal and state laws.

6.     Whether Defendants altered the employee information card after Plaintiff's termination to identify his ethnicity.  Galarza affidavit, ¶25.

7.     Whether Plaintiff's performance was exemplary, including contested issues as to:

a.     Whether he failed to train new employees; Galarza affidavit, ¶¶51-54

b.     Whether he took off excessive time from work and  whether the records were manipulated to falsely represent the same; Galarza affidavit, ¶¶55-60;

c.     Whether Lombard directed the sale to England, Galarza affidavit, ¶61-69;

d.     Whether Plaintiff viewed pornography on his computer, Galarza affidavit, ¶70-73;

e.     Whether Lombard directed the termination of Drake Viscone, Galarza affidavit, ¶40-41;

f.     Whether Lombard was concerned with the hiring of a person with a DWI conviction, Galarza affidavit, ¶42;

g.     Whether Lombard was personally involved in every hire and termination during Plaintiff's tenure, Galarza affidavit, ¶36.

h.     Whether the 1999 President's Award recognized outstanding achievement by Plaintiff. Galarza affidavit, ¶¶30-35.

8.     Whether Defendants terminated Plaintiff for racial and ethnic discrimination, poor performance or a corporate reorganization.

9.     Whether Defendants' claim that Plaintiff was terminated because of a corporate reorganization is a pretext for racial and ethnic discrimination.

10.    Whether Defendants' conduct was extreme and outrageous.

11.    What were the terms of the contract with respect to the payment of wages,

bonuses and equity in the dealership.

**ERNESTO GALARZA**
**PLAINTIFF**


By:    _____
            Charles D. Houlihan, Jr.
            Federal Bar No. CT 11416
            Post Office Box 582
            Simsbury, CT 06070

            Telephone:   (860) 658-9668
            E-Mail:      charles.houlihan@sbcglobal.net
            Telecopier:  (860) 658-1339

**ATTORNEY FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing has been mailed by United States mail, postage pre-paid, to the following:

Kevin Brady, Esq.
Halloran & Sage
One Goodwin Square
225 Asylum Street
Hartford CT 06103

on May 24, 2004.

_____
        Charles D. Houlihan, Jr.

February 22, 2001

Ms. Fem Bogle-Assegai
CHRO
50 Linden Street
Waterbury, CT   06702

          Re:   **Galarza v. Lombard Ford & Robert Lombard**
                  **CHRO No.   0130160**
                  **EEOC No.   16aa03495**

Dear Sir/Madam:

The referenced proceeding was dismissed pursuant to subsection (b) of section 46a-83, and the complainant **does not request reconsideration** of such a dismissal as provided in subsection (e) of said section 46a-83.  Please issue a release to sue so that we may proceed to bring a civil action pursuant to § 46a-83a.

Thank you for your prompt attention to this matter.

          Sincerely yours,

          Charles D. Houlihan, Jr.

c:     Ernesto Galarza

February 12, 2001

Equal Employment Opportunity Commission
One Congress Street - Room 1001
Boston MA   02114

Re:    **Galarza v. Lombard Ford & Robert Lombard**

**EEOC No.    16aa03495**

Dear Sir/Madam:

I represent the Complainant in the referenced complaint.  The complaint was administratively dismissed by the Connecticut Commission on Human Right and Opportunities.

Mr. Galarza requests that the EEOC issue a right to sue letter so that he may pursue his rights in the courts.  Given the enormous volume of matters filed with the EEOC, the issuance of a right to sue letter will be the most efficient disposition of this complaint.

Thank you for your attention to this matter.   If you have any questions, please call.

Sincerely yours,


Charles D. Houlihan, Jr.

c:    Ernesto Galarza